# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| Peter B.,<br><br>                    Plaintiff,<br><br>v.<br><br>Kilolo Kijakazi, Acting Commissioner of<br>Social Security,[1]<br><br>                  Defendant. | Civil No. 3:20-cv-00966-TOF<br><br><br><br>March 30, 2022 |

## RULING ON PENDING MOTIONS

The Plaintiff, Peter B.,[2] appeals the decision of the Commissioner of Social Security ("Commissioner" or "Defendant"), rejecting his application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. (Compl., ECF No. 1.)  He has moved the Court for an order reversing or remanding the Commissioner's decision. (*Id.* at 3; ECF No. 22.)  The Commissioner has moved for an order affirming that decision. (ECF No. 24.)

The Plaintiff makes four principal arguments for reversal or remand.  First, he argues that the Administrative Law Judge ("ALJ") erred at Step Five of the five-step sequential evaluation process by relying on faulty testimony from, and a faulty hypothetical to, a vocational expert

---

[1]     When the Plaintiff filed this action, he named the then-Commissioner of the Social Security Administration, Andrew Saul, as the defendant. (Compl., ECF No. 1.)  Commissioner Saul no longer serves in that office.  His successor, Acting Commissioner Kilolo Kijakazi, is automatically substituted as the defendant pursuant to Fed. R. Civ. P. 25(d).  The Clerk of the Court is respectfully requested to amend the caption of the case accordingly.

[2]     Pursuant to Chief Judge Underhill's January 8, 2021 Standing Order, the Plaintiff will be identified solely by first name and last initial, or as "the Plaintiff," throughout this opinion. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

("VE"). (ECF No. 22-2, at 1-11.) Second, he asserts that the ALJ erred when she determined that his alcohol abuse was material to the question of his disability. (*Id.* at 11-15.) Third, he claims that the ALJ erred at Step Two of the five-step process when she found that his respiratory, gastrointestinal and pancreatic impairments were non-severe. (*Id.* at 15-18.) Fourth and finally, he claims that the ALJ erred in her assessment of the medical opinion evidence. (*Id.* at 18-24.)

Having carefully considered the parties' submissions, and having carefully reviewed the entire, 916-page administrative record, the Court concludes that the ALJ committed no reversible legal error and that her decisions were supported by substantial evidence. Accordingly, the Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 22) is **DENIED**, and the Commissioner's Motion for an Order Affirming the Decision (ECF No. 24) is **GRANTED**. The undersigned will therefore direct the Clerk of the Court to enter judgment in the Commissioner's favor, as set forth more fully in Section IV below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff applied for Title XVI SSI benefits on March 18, 2016. (R. 210-18.) He claimed that he could not work due to "chronic pancreatitis, high blood pressure, diabetes, constant vomiting, hypertension and cholesterol issues." (R. 117-18, 136.) He alleged a disability onset date of July 15, 2014. (R. 210.)

A Social Security Administration ("SSA") disability claims adjudicator opened a file and sent the Plaintiff's medical record off for evaluation by Dr. Lois Wurzel, M.D. (R. 127.) Dr. Wurzel noted the Plaintiff's "chronic pancreatitis," but observed that it was in a "setting of active chronic alcoholism." (R. 126.) She added that his "abdominal imaging [was] unremarkable." (*Id.*) With respect to high blood pressure, she noted that the Plaintiff was taking anti-hypertensive medication, and that he had recently had a blood pressure reading of 150/100 and an "unremarkable [cardiovascular] exam." (*Id.*) As to diabetes, she noted that the Plaintiff was taking Metformin;

2

that he had an A1C reading of 5.4[3]; and that one of his medical providers had recorded "[n]o sensory deficits" at a recent exam. (*Id.*) And with respect to "cholesterol issues," the doctor noted that the Plaintiff had been taking Atorvastatin and that his cholesterol levels presented "[n]o functional limitation." (*Id.*) In summary, she concluded that the Plaintiff had only one medically determinable impairment – "5690 – Other Disorders of the Gastrointestinal System" – but that that impairment was non-severe. (R. 127.)

Although the Plaintiff had not asserted any psychological impairment as a basis for disability, his medical record contained a number of references to mental health issues, along with treatment records from a therapist. (R. 117-33.) The SSA therefore sent his medical record to Dr. Katrin Carlson, Psy.D., for evaluation. (R. 128.) After review, Dr. Carlson concluded that the Plaintiff had two medically determinable psychological impairments – "2960 – Depressive, Bipolar and Related Disorders" and "3000 – Anxiety and Obsessive-Compulsive Disorders" – and that both impairments were severe. (R. 127.) Yet she also concluded that despite these impairments, the Plaintiff was no more than moderately limited in any area of mental functioning. (R. 128-30.) With Dr. Wurzel's and Dr. Carlson's evaluations in hand, on June 20, 2017, the SSA determined that the Plaintiff was "not disabled." (R. 132.)

The Plaintiff then requested that the SSA reconsider its decision. (R. 167-69.) Dr. Barbara Coughlin, M.D., evaluated his physical impairments at the reconsideration level, and noted that his "chronic pancreatitis . . . has improved since he started on medical marijuana." (R. 147.) The

---

[3]     "According to the National Institute of Diabetes and Digestive and Kidney Diseases, [t]he A1C test is a blood test that provides information about a person's average levels of blood glucose, also called blood sugar, over the past 3 months, and an A1C level of below 5.7 percent is normal, an A1C level of 5.7 to 6.4 percent indicates prediabetes, and an A1C level of 6.5 percent or above is indicative of diabetes." *Covey v. Colvin*, 204 F. Supp. 3d 497, 501 n.3 (W.D.N.Y. 2016) (internal quotation marks omitted).

doctor also observed that the Plaintiff had regained weight that he had lost during an earlier bout of pancreatitis, and that "he feels that his symptoms are manageable." (*Id.*)  She noted a diagnosis of chronic obstructive pulmonary disease, but stated that it had "improved on [medication]" and that he "has had no recent significant exacerbations." (*Id.*)  Whereas Dr. Wurzel had concluded that the Plaintiff had only one medically determinable physical impairment, Dr. Coughlin concluded that he had two – "5960 – Other Disorders of the Gastrointestinal System" and "4960 – Chronic Respiratory Disorders."  But she also determined that both impairments were non-severe. (R. 148.)

Dr. Kenneth Bangs, Ph.D., reviewed the psychological portion of the file at the reconsideration level. (R. 148-52.)  As Dr. Carlson had done, Dr. Bangs concluded that the Plaintiff suffered from the severe impairments of "depressive, bipolar and related disorders" and "anxiety and obsessive-compulsive disorders." (R. 148.)  But he also agreed with Dr. Carlson that these impairments led to no more than a moderate limitation in any dimension of mental functioning. (R. 150-52.)  With Dr. Coughlin's and Dr. Bangs' evaluations in the file, the SSA affirmed its initial determination of "not disabled" on January 22, 2018. (R. 171.)

The Plaintiff then requested a hearing before an ALJ (R. 174), and Judge Deirdre R. Horton held a hearing on November 8, 2018. (R. 37-83.)  At the hearing, the Plaintiff acknowledged having abused alcohol in the past. (*See* R. 69, 71; *see also* ECF No. 22-2, at 12 ("It is clear that [Plaintiff] has a history of alcohol abuse, which he himself admitted.").)  But he claimed that even after "the alcohol issues stopped," "[t]he pancreatitis continued" – and moreover, he claimed that he still vomited on a daily basis. (R. 55.)  At the same time, he testified that his impairments did not prevent him from engaging in all activities of daily living.  Among other things, he was still able to "do a lot of walking." (R. 44, 60.)

A VE named Dennis King also testified at the hearing.  (R. 73-87.)  The ALJ asked VE King whether a person with no exertional limitations – but with limitations to simple, routine tasks in a low-stress environment – could find work in the national economy.  (R. 74-75.)  He responded that such a person could perform the jobs of "janitor," "dishwasher" and "order picker."  (R. 75.)  He further stated that there were 2,604,000 janitor positions, 540,200 dishwasher positions, and 2,046,040 order picker positions available nationally.  (*Id.*)  Upon cross-examination by the Plaintiff's attorney, VE King explained that these figures reflected the number of jobs in the larger Standard Occupational Classification ("SOC") codes of which janitor, dishwasher and order picker formed parts – not for the three jobs themselves.  (R. 83.) But he went on to explain that, at least in the case of dishwashing, there were at least 460,000 jobs available even if one drilled down below the SOC level to the level of "restaurant . . . dishwashers."  (R. 84; *see also* discussion, Section III.D *infra*.)  In any event, he testified that even these jobs would become unavailable if the Plaintiff was absent from work more than ten percent of the time.  (R. 77.)

After the hearing, the ALJ issued an unfavorable decision.  (R. 12-28.)  As will be discussed below, ALJs are required to follow a five-step sequential evaluation process in adjudicating Social Security claims, and Judge Horton's written decision followed that format.  At Step One of her analysis, she found that the Plaintiff had not engaged in substantial gainful activity since 2016.  (R. 18.)  At Step Two, she found that the Plaintiff suffers from the severe impairments of anxiety disorder, depressive disorder, and alcohol use disorder.  (*Id.*)  At Step Three, she concluded that the Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of one of the "Listings" – that is, the impairments listed in 20 C.F.R. 404, Subpart P, Appendix 1.  (R. 18-19.)  She then determined that, notwithstanding his impairments, including the substance use disorder, the Plaintiff retained the residual functional capacity to:

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine tasks; a low-stress environment with no strict time or production quotas, but can self-pace.  No work with the general public and in an environment with only minor changes in routine.  He would be expected to be absent from work 4 or more times per month.

(R. 19.)  At Step Four, the ALJ found that the Plaintiff was unable to perform any of his past relevant work.  (R. 22.)  Finally, at Step Five, the ALJ relied on the VE's testimony to find that, "considering all of the claimant's impairments, including the substance use disorder, the claimant is unable to make a successful vocational adjustment to work that exists in significant numbers in the national economy."  (R. 23.)  The ALJ found that, if the substance abuse and absenteeism were to be considered, the Plaintiff would be disabled.  (*Id.*)

Yet "[w]hen there is medical evidence of an applicant's drug addiction or alcoholism (DAA), 'the 'disability' inquiry does not end with the five-step analysis.'"  *Polanco v. Berryhill*, No. 3:18-cv-0163 (JAM), 2019 WL 2183121 at *2 (D. Conn. 2019) (quoting *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 123 (2d Cir. 2012)).  Instead, pursuant to 42 U.S.C. § 1382c(a)(3)(J), the Commissioner must further consider whether a claimant's drug and alcohol abuse – or "DAA" – "is a contributing factor material to the determination that the claimant is disabled."  *Id.* at *2.  Thus, "[t]he critical question is whether the SSA would still find the claimant disabled if [he] stopped using drugs or alcohol."  *Cage*, 692 F.3d at 123 (internal quotation marks and brackets omitted).  In cases involving DAA, SSA claim adjudicators must therefore "apply the sequential evaluation process twice."  Soc. Sec. Ruling, ("SSR") 13-2p.; Titles II & XVI: Evaluating Cases Involving Drug Addiction & Alcoholism (DAA), 2013 WL 621536, at *7 (S.S.A. Feb. 20, 2013).

In this case, the ALJ went through the sequential evaluation process a second time, in an effort to determine the materiality of the Plaintiff's substance abuse disorder.  (R. 23.)  At Step Two, she found that the Plaintiff would still have the same severe impairments of anxiety disorder and depressive disorder.  (*Id.*)  At Step Three, she found that he still would not meet the criteria of

any Listing.  (R. 24.)  She then formulated an RFC that was identical to the one that she formulated

in the first round, except that it no longer contemplated that the Plaintiff would have to miss work

four times a month:

> If the claimant stopped the substance use, he would have the functional capacity to
> perform a full range of work at all exertional levels but with the following
> nonexertional limitations: simple, routine tasks; a low-stress environment with no
> strict time or production quotas, but can self-pace.  No work with the general public
> and in an environment with only minor changes in routine.

(R. 24-25.)  In developing this RFC, the ALJ noted that the Plaintiff's medical record documented

"a pattern or significant reduction in alcohol use" between 2015 and 2017, and that

"[c]orresponding with his reduction in alcohol consumption has been an improvement in the

claimant's symptoms."  (R. 25.)

At Step Four, the ALJ found that if the Plaintiff stopped abusing substances, he would

continue to be unable to perform past relevant work.  (R. 27.)  Finally, at Step Five, the ALJ relied

on the VE's testimony to find that there are jobs that exist in significant numbers in the national

economy that the Plaintiff could perform, including janitor, dishwasher and order picker.  (R. 28.)

The ALJ therefore concluded that the Plaintiff's substance use disorder was a contributing factor

material to the determination of disability, and that he consequently was not disabled within the

meaning of the Social Security Act.  (*Id*.)  The Plaintiff appealed, but on May 6, 2020, the Appeals

Council denied his request for review.  (R. 1-3.)

The Plaintiff then filed this action on July 10, 2020.  (Compl., ECF No. 1.)  In his

complaint, he alleged that the ALJ, "Appeals Council and the Commissioner have committed error

as a matter of law" and their findings and conclusions "are not supported by substantial evidence

of record."  (*Id.* at 3.)  On December 11, 2020, the Commissioner denied the allegations of the

complaint by filing the Certified Administrative Record.  (ECF No. 19; *see also* Standing

Scheduling Order, ECF No. 6, at 2 (stating that, in the District of Connecticut, the filing of

administrative record is "deemed an Answer (general denial) to Plaintiff's Complaint").)   On

February 22, 2021, the Plaintiff moved for an "order reversing the Commissioner's decision and

awarding benefits" or "an order reversing the decision of the Commissioner, remanding the matter

to the Commissioner for a *de novo* hearing and a new Decision and Order. . . ."  (ECF No. 22-2,

at 24.)  On April 20, 2021, the Commissioner moved for an order affirming his final decision.

(ECF No. 24.)  The Plaintiff did not file a reply brief, and his time for doing so has expired.  (*See*

ECF No. 6, at 4.)  The parties' motions are therefore ripe for decision.

## II.   APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, "a claimant must establish an

'inability to do any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than [twelve] months.'"  *Smith v. Berryhill*, 740

F. App'x 721, 722 (2d Cir. 2018) (summary order) (quoting 20 C.F.R. § 404.1505(a)).   To

determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial

gainful activity."  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*,

537 F.3d 117, 120 (2d Cir. 2008)).  At Step Two, the ALJ analyzes "whether the claimant has a

severe impairment or combination of impairments."  *Id.*  At Step Three, the ALJ then evaluates

whether the claimant's disability "meets or equals the severity" of one of the "Listings" – that is,

the specified impairments listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404.  *Id.*  At Step

Four, the ALJ uses an RFC assessment to determine whether the claimant can perform any of her

"past relevant work."  *Id*.  And at Step Five, the ALJ considers "whether there are significant

numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC],

age, education, and work experience." *Id.* The claimant bears the burden of proving her case at Steps One through Four. *Id.* At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). Its role is to determine whether the Commissioner's decision is supported by substantial evidence and free from legal error. "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *See Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. In other words, "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

An ALJ does not receive the same deference if she has made a material legal error. Put differently, district courts do not defer to the Commissioner's decision "[w]here an error of law

has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.   DISCUSSION

In this case, the Plaintiff makes four principal arguments for reversal or remand.  For reasons that will become clear, it makes sense to take them in the order of the five-step sequential evaluation process, rather than the order in which he raised them in his brief.

The Plaintiff argues that the ALJ erred at Step Two in concluding that his "respiratory disorders, gastrointestinal disorders, and pancreatitis" were "non-severe impairments."  (ECF No. 22-2, at 15-18.)  Second, he says that "the ALJ failed to apply the correct analysis to [his] substance abuse," in part because she "made a medical judgment that she is wholly incompetent to make." (*Id.* at 11-15.)  Third, he contends that "[t]he treating physician rule was not followed."  (*Id.* at 18-23.)  And fourth and finally, he says that the ALJ's "findings at Step Five are unsupported," because (among other reasons) she relied on VE job incidence numbers that cannot withstand scrutiny.  (ECF No. 22-2, at 1-11.)  The Court will examine each claim of error in turn.

### A.   The Plaintiff's Claims of Step Two Error

The Plaintiff argues that the ALJ erred at Step Two when she found that his respiratory disorders, gastrointestinal disorders and pancreatitis were non-severe impairments.  (ECF No. 22-2, at 15.)  The ALJ found that "these conditions were being managed medically, and should be amenable to proper control by adherence to recommended medical management and medication compliance."  (R. 18.)  She found that his pancreatitis, "[i]n particular," "was being managed

medically and eventually required no treatment." (*Id.* (citing R. 698-701).)  The Plaintiff contends that these findings were "wholly unsupported." (ECF No. 22-2, at 16.)

The legal principles governing Step Two are well established.  At Step Two, the ALJ must determine whether the claimant has a severe, medically determinable impairment that has lasted or is expected to last for at least twelve months.  20 C.F.R. § 416.920(a)(4)(ii).  The SSA's regulations do not define the term "severe impairment," but instead define "non-severe impairment."  *Dawn Lyn C. v. Kijakazi*, No. 3:20-cv-545 (TOF), 2021 WL 4398372, at *4 (D. Conn. Sept. 27, 2021) (quoting *Larkin v. Astrue*, No. 3:12-cv-35 (WIG), 2013 WL 4647243, at *5 (D. Conn. Apr. 29, 2013), *report and recommendation adopted in part, rejected in part*, 2013 WL 4647229 (D. Conn. Aug. 29, 2013)).  "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. § 416.922(a); *see also* Social Security Ruling ("SSR") 96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996).  By implication, therefore, a "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work."  *Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014) (summary order).

The purpose of the Step Two severity analysis is to screen out only the weakest claims.  "[T]he standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases."  *McIntyre*, 758 F.3d at 151.  In other words, "[t]he standard at step two is quite low," *O'Connor v. Saul*, No. 1:18-cv-00740 CJS, 2020 WL 1242408, at *3 (W.D.N.Y. Mar. 16, 2020), and the "claimant has a minimal burden at step two as the severity regulation is designed to eliminate only clearly insubstantial claims."  *Serrano v. Astrue*, 645 F. Supp. 2d 64, 66 (D. Conn. 2009).  Nonetheless, a decision at Step Two "is like almost any other ALJ decision in that it is entitled to deference from this Court if it is free from

legal error and supported by substantial evidence." *Dawn Lyn C.*, 2021 WL 4398372, at *5 (citing *Shaw*, 221 F.3d at 131). "And the substantial evidence standard is itself deferential." *Id.* (citing *Stonick v. Saul*, No. 3:19-cv-1334 (TOF), 2020 WL 6129339, at *3 (D. Conn. Oct. 19, 2020)).

Here, the ALJ had a substantial evidentiary basis for regarding the Plaintiff's respiratory, gastrointestinal and pancreatic impairments as "non-severe." The Plaintiff argues that the ALJ disregarded his "daily vomiting" (ECF No. 22-2, at 16), but from at least 2017 onward, he consistently denied nausea and vomiting during his visits to his medical providers. (*See* R. 763 (May 9, 2017); R. 770 (June 2, 2017); R. 768 (June 26, 2017); R. 774 (June 28, 2017); R. 778 (Aug. 16, 2017); R. 784 (Nov. 20, 2017); R. 790 (Feb. 27, 2018); R. 795 (May 2, 2018).) In 2015 he had reported a sixty-pound weight loss due to his gastrointestinal issues (R. 345), but by 2017 he was gaining weight and his doctor reported that he was "in considerabl[y] less stress and pain." (R. 698.) By early 2017 he had stopped taking his pancreatitis medication entirely (*see* R. 715), and later that year his primary care provider noted that he had "not followed up" with his gastroenterologist "in years." (R. 729.) With respect to his respiratory issues, the treatment notes repeatedly document him denying shortness of breath (*e.g.*, R. 582, 586, 592, 601, 604), and he testified that he regularly goes for walks without any breathing issues. (*See* R. 62-64 (testifying about walking regimen, and identifying "burning feet" and "agoraphobia" as the only reasons why he misses some days).) All of this is substantial evidence supporting the ALJ's conclusion that the Plaintiff's respiratory, gastrointestinal and pancreatic impairments did not significantly limit his physical ability to do work. (R. 18.)

The Plaintiff cites contrary evidence in the record, as detailed in his brief. (ECF No. 22-2 at 16 and n.31.) But "[i]t is not the function of this Court to re-weigh evidence or consider *de novo* whether [a claimant] is disabled." *Teena H. o/b/o N.I.K. v. Comm'r of Soc. Sec.*, 521 F. Supp. 3d

287, 292 (W.D.N.Y. 2021).   Rather, "[a]bsent a legal error, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the Court might have ruled differently had it considered the matter in the first instance." *Russell v. Saul*, 448 F. Supp. 3d 170, 175 (D. Conn. 2020).   Stated differently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

Finally, the Plaintiff makes a one-sentence argument that the ALJ erred at Step Two by failing to consider his post-traumatic stress disorder.  (ECF No. 22-2, at 16 (citing R. 873 and 878-79).)  But that was not his diagnosis at the time of the hearing; by late 2016, the Plaintiff's mental health clinicians were assessing him with panic attacks, generalized anxiety disorder and depression.  (R. 653; *see also* R. 855.)  The ALJ addressed those diagnoses in her decision.  (R. 20 (noting that the Plaintiff had "been diagnosed with affective disorder," "anxiety disorder," "adjustment disorder" and "depressed mood"); R. 23 (concluding that if the Plaintiff stopped using alcohol, his "anxiety disorder and depressive disorder" would still be severe impairments); R. 27 (considering whether the Plaintiff's claimed "limitations in mental and social abilities" were supported by the record).)  In short, the ALJ applied the proper legal standards and had substantial evidence for her conclusions.  Accordingly, there is no error at Step Two.

### B.    The Plaintiff's Claims of Error With Respect to Substance Abuse

The Plaintiff argues that the ALJ "failed to apply the correct analysis" to his substance abuse.  (ECF No. 22-2, at 11.)  In particular, he contends that the ALJ made an improper "medical judgment" when she found that his periods of reduced alcohol consumption corresponded with significant improvements in his physical and mental symptoms – and, by extension, that he would

13

not be disabled if he stopped his substance use.  (*Id.* at 13.)  He says that he "continues to have significantly limiting physical symptoms," including "daily vomiting" and "mental impairments," "despite a sharp reduction in alcohol use." (*Id.* at 14.)  The Commissioner disagrees, and argues that "the ALJ appropriately performed the difficult but necessary task of determining Plaintiff's level of functioning if he stopped substance abuse." (ECF No. 24-1, at 7.)

The Plaintiff's argument implicates the SSA's procedures for evaluating the role of drug and alcohol abuse, or "DAA."  In 1996, Congress amended the Social Security Act to deny disability benefits to an individual if his or her "alcoholism or drug addiction" is a "material contributing factor to the disability determination." 42 U.S.C. § 423(d)(2)(C).  Since then, "[w]hen there is medical evidence of an applicant's drug or alcohol abuse, the 'disability' inquiry does not end with the five-step analysis." *Cage*, 692 F.3d at 123 (citing 20 C.F.R. § 416.935(a)).  Rather, if the ALJ finds after Steps One through Five that the claimant is disabled, she must go one step further and consider whether the claimant's DAA was material to that finding. *Id.*  As previously noted, "[t]he critical question is 'whether the SSA would still find the claimant disabled if she stopped using drugs or alcohol.'" *Id.* (quoting 20 C.F.R. § 416.935(b)(1)) (brackets omitted).  The Commissioner does not bear the burden of proving materiality; instead, "claimants bear the burden of proving . . . [the] immateriality" of their DAA. *Id.*

An ALJ may assess materiality by comparing the claimant's degree of impairment while abusing substances with his degree of impairment while sober.  In *Cage*, for example, a substance-abusing mental health patient "spoke normally, had coherent or linear thought processes," was able to "perform rote tasks," and could "interact with others adequately" on the few occasions when she showed up sober for a mental health evaluation. *Id.* at 126-27.  By contrast, she exhibited symptoms of depression and attempted suicide during periods when she was abusing cocaine. *Id.*

at 127.  The Second Circuit held that the contrast constituted "substantial evidence" supporting "the ALJ's determination that [the claimant] would not be disabled were she to discontinue her drug and alcohol abuse."  *Id.*; *accord Wehrhahn v. Colvin*, 111 F. Supp. 3d 195, 205-06 (D. Conn. 2015) (affirming ALJ decision finding "that the claimant has a greater level of functioning in the absence of substance abuse"); *Velasquez v. Astrue*, No. 11-535S, 2013 WL 1415657, at *11 (D.R.I. Feb. 22, 2013), *report and recommendation adopted*, 2013 WL 1415586 (D.R.I. Apr. 8, 2013) ("The Commissioner may base the materiality finding on record evidence during periods of sobriety.").

The Plaintiff contends that these sorts of comparisons require "medical judgment" that an ALJ "is wholly incompetent to make" (ECF No. 22-2, at 13), but this argument is contrary to binding Second Circuit precedent.  In *Cage*, the Court of Appeals expressly rejected "a brightline rule that an ALJ cannot find that drug or alcohol use is a contributing factor where there is no medical opinion addressing the issue."  692 F.3d at 126 (quotation marks omitted).  "[S]uch a rule, found nowhere in the U.S. Code or C.F.R., is unsound" because "[i]t would unnecessarily hamper ALJs and impede the efficient disposition of applications in circumstances that demonstrate DAA in the absence of predictive opinions."  *Id.*; *see also Watson v. Saul*, No. 3:19-cv-1504 (RMS), 2020 WL 5700454, at *9 (D. Conn. Sept. 24, 2020) ("Contrary to the plaintiff's contention, it is not error *per se* for an ALJ to reach a decision regarding DAA in the absence of a treating source opinion addressing whether DAA is a contributing factor to the plaintiff's alleged disability.").  Applying these principles, courts often affirm ALJ findings of materiality even when there is no medical opinion on the issue.  In *Polanco*, for example, the court affirmed a finding of materiality based solely on treatment notes reflecting "improvements in [the claimant's] thought processes

and presentation" during his brief periods of sobriety, and other notes documenting that "substance abuse exacerbates [his] mental health symptoms."  2019 WL 2183121, at *6.

Substantial evidence supports the conclusion that the Plaintiff's gastrointestinal and pancreatic symptoms improved markedly after he reduced his alcohol consumption.  The ALJ accurately noted that as early as April 2015, the Plaintiff reported to his gastroenterologist Dr. Dorfman that he had cut back on his drinking and was asymptomatic.  (R. 25, 350.)  In January 2017, the Plaintiff reported that he was feeling better with regard to his pancreatitis, and Physician Assistant Jillian Perez noted that he had discontinued his medication and had not followed up with his gastroenterologist.  (R. 25, 715.)  At that appointment, the Plaintiff complained of abdominal pain, but denied unexplained weight loss, nausea and vomiting.  (R. 25, 716.)  Indeed, the record demonstrates that the Plaintiff consistently reported to his medical provider PA Perez that he was feeling better, had not followed up with his gastroenterologist, and denied symptoms of weight loss, nausea or vomiting.  (*See* R. 25-26 (citing R. 763, 770, 774, 776, 778, 784, 790, 795).)  "Taken together, this is relevant evidence that a reasonable mind might accept as adequate to support [the] conclusion," *Cage*, 692 F.3d at 127 (internal quotation marks and citation omitted), that the medical conditions expecting to cause absenteeism four or more times per month would not be present in the absence of alcohol abuse.  (R. 19.); *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not this court, to weigh the conflicting evidence in the record.").  Faced with this substantial evidence, the Court must uphold these findings and, consequently, the ALJ's determination that the Plaintiff would not be disabled were he to discontinue his alcohol abuse.

### C.    The Plaintiff's Claims About the ALJ's Treatment of the Opinion Evidence

The administrative record contained several items of opinion evidence from the Plaintiff's treating clinicians, in addition to the opinions from Drs. Wurzel, Carlson, Coughlin and Bangs.

One such opinion came from Jillian Perez, a physician's assistant at Family Practice and Internal Medicine of New Haven County LLC, who the Plaintiff saw for physicals, diabetes checks and cholesterol monitoring. (R. 582-607, 614-20, 626-31, 702-20, 727-34, 742-93.) PA Perez opined that the Plaintiff would have to "take unscheduled breaks" "a few times a week," and would be "off task" for as much as 25% of a given workday. (R. 860-64.) Another clinician, Licensed Clinical Social Worker John Terry Dukes, opined in late 2016 that the Plaintiff "frequently [had] a problem" with "[h]andling frustration appropriately," and "always [had] a problem" with "[a]sking questions or requesting assistance." (R. 651-57.) Six months later, LCSW Dukes noted considerable improvement in those dimensions. At that time, the Plaintiff had "average ability" in the dimension of "[a]sking questions and requesting assistance," and "better than average ability" in "[h]andling frustration appropriately." (R. 687-92.) But in June 2018, LCSW Dukes rated the Plaintiff as "seriously limited" in nearly every mental ability required to do even unskilled work. (R. 855-59.)[4]

The ALJ gave these opinions more weight on the first lap through the five-step process than she did on the second. She gave PA Perez's opinion "partial weight concerning the period of time the claimant was actively abusing alcohol," and "great weight" "concerning expected absences from work" during his corresponding bouts of pancreatitis, "given the documentation of [the Plaintiff's] condition in the record." (R. 21.) But she gave PA Perez's opinion "little weight concerning the period of time the claimant was not actively abusing alcohol," because its statement "concerning expected absences from work is not supported by the record for" that period, "as her treatment notes indicated that his gastrointestinal symptoms had improved and he was not actively

---

[4] Some of LCSW Dukes' opinions were co-signed by an APRN, Philip Frick. (*E.g.*, R. 657, 859.)

receiving treatment." (R. 26 (citing R. 708, 715-20).) Similarly, the ALJ gave "great weight" to LCSW Dukes' opinions "concerning the time that the claimant was actively abusing alcohol," because his "findings that the claimant has difficulties performing tasks and with social interactions is consistent with the claimant's mental condition reported at the beginning of his psychiatric treatment." (R. 21.) But she gave those opinions "little weight concerning the time that the claimant was not actively abusing alcohol," because "[t]he findings of serious limitations in mental and social abilities related to work are not supported by the record, which indicated numerous and varied activities of daily living, including social activities." (R. 27.)

The Plaintiff assails these weight assignments in a section of his brief entitled "The Treating Physician Rule Was Not Followed" (ECF No. 22-2, at 18), but he concedes that this is a misnomer. For claims that, like the Plaintiff's, were filed before March 27, 2017, the "treating physician rule" obliged ALJs to give "controlling weight" to a treating physician's opinion when the opinion was supported by and consistent with the record. 20 C.F.R. § 416.927(c)(2). To trigger that rule, however, the opinion had to come from an "acceptable medical source." 20 C.F.R. § 416.927(a). In this case, the Plaintiff admits that PA Perez, LCSW Dukes and APRN Frick were not "acceptable medical sources." (ECF No. 22-2, at 18); *see also* 20 C.F.R. § 416.913(a) (effective Sept. 3, 2013 – Mar. 26, 2017) (defining "acceptable medical source" to include "[l]icensed physicians" and '[l]icensed or certified psychologists" but not physician's assistants, APRNs or social workers). He consequently acknowledges that "in its strict form the 'treating physician rule is not applicable,' as 'controlling weight' is not an issue." (*Id.*)

The Plaintiff nonetheless argues that even if her treaters' opinions were not entitled to "controlling weight," the ALJ committed reversible error when she failed to go through the same weight-assignment *process* that she would have had to go through if the opinions had come from

18

licensed physicians or psychologists.  Specifically, he argues that the ALJ was required to work through the so-called "*Burgess* factors"[5] before assigning less-than-controlling weight to the three treaters' opinions, even though they were not "acceptable medical sources."  (ECF No. 22-2, at 18-19.)  But the Plaintiff cites no authority for the proposition that the ALJ owes the same process to a treating PA, APRN or LCSW as to a treating physician or psychologist, and indeed the regulations are to the contrary.  When assigning weight to "[o]pinions from medical sources who are not acceptable medical sources," the ALJ was required only to "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning."  20 C.F.R. § 416.927(f).  In particular, she was not obliged to discuss all of the factors listed in 20 C.F.R. § 416.927(c) – the factors mirrored in *Burgess* and *Estrella* – because "not every factor for weighing opinion evidence will apply" to every such opinion.  20 C.F.R. § 416.927(f)(1); *see also* 20 C.F.R. § 416.927(c) (explaining that the six-part test applies only to "medical opinions"); 20 C.F.R. § 416.927(a)(1) (explaining that, to qualify as a "medical opinion," the opinion must come from an "acceptable medical source[]"); *Grisel A. v. Kijakazi*, No. 3:20-cv-719 (TOF), 2021 WL 4350565, at *5 (D. Conn. Sept. 24, 2021) (citing 20 C.F.R. § 416.927(f)(1).  An ALJ's treatment of such an opinion will be affirmed if her "discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow [her] reasoning."  *Id.*

---

[5]     In *Burgess*, the Second Circuit held that ALJs must "consider several factors" in deciding how much weight to assign to a treating physician's opinion.  537 F.3d at 129.  As synthesized in subsequent cases, those factors include "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining evidence; and (4) whether the physician is a specialist."  *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (brackets omitted).

Here, the ALJ met that undemanding test.  In the case of PA Perez, the ALJ explained that the opinion was "in a checklist format, providing very few explanations," and more importantly it was "not supported by the record for the period that the claimant was not abusing alcohol."  (R. 26.)  And she went on to explain that the opinion was inconsistent with the record because PA Perez's own "treatment notes indicated that [the Plaintiff's] gastrointestinal symptoms had improved and he was not actively receiving treatment."  (*Id.* (citing, *inter alia*, R. 708 (2017 record reflecting that Plaintiff "has been feeling better" and had discontinued his pancreatitis medications and stopped "follow[ing] up" with the physician who was treating it)).)  With respect to LCSW Dukes and APRN Frick, the ALJ gave the June 2018 opinion "little weight concerning the time that the claimant was not actively abusing alcohol" because "[t]he findings of serious limitations in mental and social abilities related to work are not supported by the record, which indicated numerous and varied activities of daily living, including social activities."  (R. 27.)  And she explained what caused her to say this: she cited treatment notes reflecting that the Plaintiff took daily walks, helped his brother with yard work, and worked on carpentry projects (*id.* (citing R. 846)); another note indicating that the Plaintiff canceled an appointment because he "need[ed] to help a friend move" (*id.* (citing R. 900)) and still other notes indicating that he traveled to Foxwoods Casino and Misquamicut Beach notwithstanding his claimed agoraphobia.  (*Id.* (citing R. 905, 910, 913).)  The Plaintiff protests that these activities "do[] not translate into an ability to work eight hours a day" (ECF No. 22-2, at 23), but he "cannot plausibly charge the ALJ with the legal error of not sufficiently explaining [her]self."  *Grisel A.*, 2021 WL 4350565, at *5.  Here, as in *Grisel A.*, "[t]he Court concludes that, in explaining [her] reasons for assigning little weight to" the treaters' opinions, "the ALJ complied with [her] obligations under" 20 C.F.R. § 416.927(f).  *Id.*

The Plaintiff argues that the ALJ erred in giving more weight to the opinions of the non-examining state agency consultants than to the opinions of his own treaters (ECF No. 22-2, at 21-22), but here too, the law contradicts him.  He says that it was wrong for the ALJ to give "great weight" to Drs. Wurzel and Coughlin because the former is a pathologist and the latter a pediatrician, and neither one is a specialist in gastroenterology.  (*Id.* at 21.)  But other courts have rejected the argument that a state agency consultant must be a specialist in the relevant field before his or her opinion can be relied upon.  In *Lovett v. Berryhill*, for example, the court observed that a consulting physician "need not be" "a specialist in the relevant area of medicine," because "state agency medical consultants are experts in the Social Security disability programs, and in appropriate circumstances, their opinions may be entitled to greater weight than the opinions of treating or examining sources."  No. 3:17-cv-637 (SRU), 2018 WL 4502179, at *8 (D. Conn. Sept. 20, 2018) (quoting SSR-90-6p, 1996 WL 374180, at *2-3) (brackets, ellipses and quotation marks omitted); *see also Peltonich v. Colvin*, No. 13-11246-JGD, 2014 WL 4716190, at *11 (D. Mass. Sept. 19, 2014), *aff'd* (1st Cir. Aug. 24, 2015) (rejecting argument that non-examining state agency consultant should not have been relied upon because he was not opining within his specialty).  The Plaintiff also cites cases for the general proposition that non-examining consultants should ordinarily not be given greater weight than the claimant's own treaters (ECF No. 22-2, at 21-22), and that general statement is true enough.  But it is equally true that "the regulations permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."  *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (observing that the opinion of a treating physician "is not binding if it is contradicted by substantial evidence . . . and the report of a consultative physician may constitute such evidence").  That is the case here; Dr. Wurzel's

opinions, for example, are supported by citations to imaging studies, blood pressure readings, and A1C readings.

### D.     The Plaintiff's Claims of Step Five Error

Finally, the Plaintiff claims that the ALJ's "findings at Step Five are unsupported."  (ECF No. 22-2, at 1-11.)  At that step, the ALJ determined that in light of the Plaintiff's RFC, he would be able to perform the jobs of janitor, dishwasher and order picker if he stopped his substance use. (R. 27-28.)  The ALJ then determined that these three jobs were available in significant numbers in the national economy.  (R. 28.)  She relied on the VE's testimony in reaching both of these conclusions (R. 27-28), and in particular, she relied on the VE's statement that there are 2,604,000 janitor jobs available in the national economy; 540,200 dishwasher jobs; and 2,046,040 order picker jobs.  (R. 28; *see also* R. 75.)

The legal principles governing Step Five are well settled.  At that step, "the Commissioner must determine that significant numbers of jobs exist in the national economy that the plaintiff can perform."  *McIntyre*, 758 F.3d at 150.  "An ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert."  *Id.*  If the ALJ chooses the latter route, she "may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumption upon which the vocational expert based his opinion."  *Id.*  Although disability claimants bear the burden of proof at Steps One through Four, "at step five, the burden shifts to the Commissioner to demonstrate that there is other work that the claimant can perform, based on the claimant's RFC, age, education, and past relevant work."  *Torres v. Colvin*, No. 3:16-cv-809 (JAM), 2017 WL 1734020, at *2 (D. Conn. May 3, 2017) (citing *McIntyre*, 786 F.3d at 150).

In this case, the Plaintiff begins by assailing the methodology underlying the VE's job incidence numbers.  At the hearing, the VE explained that he obtained the figures "from the Bureau of Labor Statistics . . . using the [Dictionary of Occupational Titles, or "DOT"] and . . . going to a [Standard Occupational Classification, or "SOC"] code."  (R. 83.)  In other words, after using the DOT to identify the jobs that he thought the Plaintiff could do, the VE then used the corresponding SOC code to determine the number of positions available in the national economy for each of those jobs.  But as the Plaintiff points out, the DOT and the SOC do not align with each other.  (ECF No. 22-2, at 3-4.)  Using the order picker job as his example, he notes that that job is but one of 553 DOT job titles that is included in SOC 51-9198.00, "Helpers – Production Workers."  (*Id.* at 4.)  Thus, the Plaintiff argues that the VE had no basis for saying that there were 2,046,040 order picker jobs in the national economy; the most he reasonably could have said was that there were 2,046,040 "Helper – Production Worker" jobs, of which order picker is but one of 553.  (*Id.*)

Because VEs often use these two data sources to derive job incidence numbers, other plaintiffs have made the same argument.  Some courts in this district and circuit have expressed concern about the misalignment between the DOT and the SOC, but they nonetheless have declined to reach the conclusion that the Plaintiff urges here.  In *DeBiase v. Saul*, for example, the court was "sensitive to the plaintiff's concern about the vague nature of [a VE's] testimony regarding his methodology in arriving at the job incidence numbers for the positions he identified," a methodology that seemingly failed to account for the misalignment between the two data sources. No. 3:19-cv-68 (RMS), 2019 WL 5485269, at *11 (D. Conn. Oct. 25, 2019).  It nevertheless affirmed the ALJ's decision, because the law "does not require a detailed scrutiny of a vocational expert's methods."  *Id.* (citing *Lillis v. Colvin*, No. 3:16-cv-269 (WIG), 2017 WL 784949, at *5 (D. Conn. Mar. 1, 2017)).  "An identification of the general sources and consideration of the

experience and expertise of the vocational expert suffices; the ALJ need not inquire into the vocational expert's precise methodology." *Id.* (citing *Bradley v. Berryhill*, No. 3:16-cv-1478 (JAM), 2017 WL 3314000, at *3-4 (D. Conn. Aug. 3, 2017)).  Similarly, in *Cortes v. Berryhill* the court described the VE's failure to account for the misalignment as "troubling," but nonetheless affirmed the ALJ's opinion because "the vocational expert need not provide the exact number of jobs available for a position."  No. 3:16-cv-1910 (JCH), 2018 WL 1392903, at *11 (D. Conn. Mar. 19, 2018) (citing *Brault*, 683 F.3d at 450).

The Plaintiff cites a California case that reached a different result.  (ECF No. 22-2, at 5-6.)  In *Vo v. Colvin*, a VE testified that the claimant "could perform the position of 'inspector' as described in DOT 669.687-014," and "the position of 'assembler' as described in DOT 706.684-030."  No. EDCV 14-01105-DFM, 2015 WL 1383138, at *4 (E.D. Cal. Mar. 24, 2015).  The VE then testified that there were 410,750 "inspector" jobs, and 229,240 "assembler" jobs, available in the national economy.  *Id.*  The ALJ concluded that the claimant was not disabled, but on appeal the district court observed that DOT code 669.687-014 "is actually entitled 'dowel inspector,'" "someone in the woodworking industry who 'inspects dowel pins for flaws.'"  *Id.* (quoting Dict. of Occupational Titles, 669.687-104 Dowel Inspector, 1991 WL 686074).  It likewise observed that DOT code 706.684-030 "is actually entitled 'atomizer assembler,'" "someone who 'assembles component parts of perfume atomizers.'"  *Id.* (quoting Dict. of Occupational Titles, 706.684-030 Atomizer Assembler, 1991 WL 679052).  The court reversed the ALJ's decision and remanded the case because "[i]t strains credulity to accept the VE's testimony that there are 410,000 people nationally . . . making a living by inspecting wooden dowels, or that there are 229,000 people nationally . . . making a living assembling perfume bottle atomizers."  *Id.*  "Remand is appropriate where 'no reasonable mind could accept the employment numbers proffered by the VE as

substantial evidence,'" and in Ms. Vo's case, "'no reasonable mind' could believe" the VE's numbers. *Id.* at *5 (quoting *Farias v. Colvin*, 519 F. App'x 439, 440-41 (9th Cir. 2013) (summary order)).

This case differs from *Vo* in two key respects. First, the VE in this case provided some testimony about how the SOC numbers break down over the individual jobs within the classification. Specifically, in the case of the "dishwasher" SOC code, he explained that there were 540,200 jobs in the national economy for all jobs within that code – but he went on to say that "like, 85, 90%" are restaurant dishwashing positions. (R. 84.) To be sure, he did not explain where this percentage came from, but the Plaintiff did not ask him to (*see id.*), and in any event an ALJ may permissibly regard such testimony as "substantial evidence" even when the VE does not disclose the underlying data. *Cf. Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019) (rejecting plaintiff's proffered "categorical rule" that, in "every case in which a vocational expert refuses a request for underlying data," the "withholding of such data . . . prevent[s] her testimony from qualifying as substantial evidence"); *see also Saad v. Berryhill*, No. 3:17-cv-2000 (KAD), 2019 WL 1429541, at *3 (D. Conn. Mar. 30, 2019) ("An ALJ does not err when he relies on a vocational expert's testimony that is based on personal experience, labor market surveys, and published statistical sources in determining the number of jobs available.") (citing *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 407 (D. Conn. 2012), *aff'd*, 515 F. App'x 32 (2d Cir. 2013) (summary order)). Second, to say that there are about 460,000 restaurant dishwasher jobs in the national economy – that is, 85% of 540,200 – is not like saying that there are 410,000 wooden dowel inspectors. It is not something that "no reasonable mind could believe."

In this case, the ALJ did not commit reversible error in relying on the VE's job incidence numbers. Even if one disregards the "janitor" and "order picker" figures, the VE's testimony about

the number of dishwasher jobs provides substantial evidentiary support for the ALJ's conclusion that "there would be a significant number of jobs in the national economy that the claimant could perform." *See Edwards v. Berryhill*, No. 3:17-cv-298 (JCH), 2018 WL 658833, at *15 (D. Conn. Jan. 31, 2018) (agreeing with the Commissioner that, even if some of the VE's numbers were "dubious," "the ALJ was required to identify only <u>one</u> job existing in significant numbers") (emphasis in original).  460,000 jobs is a "significant number," *see DeBiase*, 2019 WL 5485269, at *10 (collecting cases), and indeed the Plaintiff does not contend otherwise.  (*See* ECF No. 22-2, at 1-11.)

The Plaintiff also argues that the ALJ presented a defective hypothetical to the VE because she did not give meaningful weight to the opinion of any treating physician or clinician (ECF No. 22-2, at 9), but this argument finds no support in the law or the facts of this case.  It is well established that an ALJ may discount the opinion of even a treating physician – let alone a treating PA, LCSW or APRN – if that opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in the . . . case record." *Stonick*, 2020 WL 6129339, at *3 (quoting 20 C.F.R. § 416.927(c)(2)).  As explained in Section III.C *supra*, where the ALJ assigned less than "meaningful" weight to the opinions of PA Perez, LCSW Dukes and APRN Frick, she had a sound basis for doing so.  An ALJ does not err when she "decline[s] to include in [her] hypothetical question symptoms and limitations that [she] had reasonably rejected." *Priel v. Astrue*, 453 F. App'x 84, 87-88 (2d Cir. 2011) (summary order) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)).

Finally, the Plaintiff claims that the ALJ erred in failing to include any exertional limitations in her hypothetical or her RFC.  (ECF No. 22-2, at 10-11.)  But he does not support this argument with a citation to any evidence of such limitations; he merely asks the Court to conclude

that it is "preposterous" to expect a 178-pound man to work at the very heavy exertional level.  (*Id.* at 10-11.)  Disability claimants bear the burden to prove their limitations, and that burden is not met by unsupported, *ipse dixit* statements of this kind.  Although the ALJ determined that the Plaintiff could perform a "full range of work at all exertional levels" the VE testified that the jobs of Janitor, Dishwasher and Order Picker are performed at a medium exertional level, not the heavy exertional level that the Plaintiff asserts.[6]  (R. 24, 28, 75, ECF No. 22-2, at 10-11.)  Moreover, there was substantial evidence of an ability to lift, walk and stand at the light exertional level (*e.g.*, R. 862-63), and of the availability of nearly half a million light exertional jobs in the national economy that the Plaintiff could perform.  (R. 75-76 (testimony of VE King regarding the availability of laundry worker, garment sorter and electronics pre-assembler jobs).)  Thus, if it was error to preclude work at the "very heavy," "heavy" or "medium" exertional levels, that error was harmless.  *See Tyrone P. v. Saul*, No. 3:20-cv-112 (SALM), 2021 WL 288788, at *12 n.8 (D. Conn. Jan. 28, 2021) (observing in *dicta* that it would have been harmless error for an ALJ to omit a limitation from a Step Five analysis, where it is clear that the limitation would not have affected that analysis); *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 590 (W.D.N.Y. 2018) (finding harmless error in failure to include limitations in an RFC where positions identified by VE account for such limitations); *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 816 (3d Cir. 2016) (finding

---

[6]     "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 404.1567(c).  Whereas "[h]eavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work."  *Id.* at § 404.1567 (d).

harmless error where inclusion of plaintiff's moderate limitation in social functioning in hypothetical would not have changed the VE's answers).

## IV.    CONCLUSION

For the reasons stated above, the Court concludes that the ALJ's decision was supported by substantial evidence and free from legal error.  Therefore, the Plaintiff's Motion for Order reversing or remanding the Commissioner's decision (ECF No. 22) is **DENIED**.  The Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 24) is **GRANTED**.

This is not a recommended ruling.  The parties consented to the jurisdiction of the undersigned Magistrate Judge, who may therefore direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  (ECF No. 10.)  Appeals may be made directly to the appropriate United States Court of Appeals.  *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).  The Clerk of the Court is respectfully directed to enter judgment in favor of the Defendant, and to close this case.

So ordered this 30th day of March 2022 , at Hartford, Connecticut.

*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge